Booth, Chief Justice,
delivered the opinion of the court:
The history of this case is as follows: May 26, 1920, Congress enacted a special jurisdictional act referring the claim of the plaintiff Indians to this court (41 Stat. 623) ; April 8, 1935, this court made findings of fact, delivered a written opinion, and entered judgment dismissing plaintiffs’ petition, 81 C. Cls. 79. The Supreme Court on December 9, 1935, affirmed the judgment of this court, 296 U. S. 244, 255.
Epitomizing the findings of fact, it is sufficient to state that plaintiffs’ present reservation was set aside for them by the treaty of October 14, 1864. In this same year Congress by an act granted to the State of Oregon a large tract of land to aid the State in the construction of a military road. Included within this grant by mistake were 111,385 acres of plaintiffs’ reservation lands upon which allotments to individual Indians had been granted.
When the mistake was discovered by the Government the Attorney General of the United States commenced and *462 vigorously prosecuted in the proper courts legal proceedings to recover the 111,385 acres for the Indians. United States v. Oregon Central Military Road Co., 140 U. S. 599, United States v. California and Oregon Land Co., 148 U. S. 31; Id. 192 U. S. 355. The courts decided adversely to the Government. March 3, 1905, the Secretary of the Interior was ■directed by an act of Congress to ascertain the value of "the 111,385 acres and to also ascertain upon what terms and price the California & Oregon Land Company, owner of the lands, would convey the same back to the United States. If .a reconveyance could not be effected, the Secretary was to negotiate, if possible, terms and conditions for an exchange ■of the 111,385 acres for other lands within the Indians’ Teservation.
June 21, 1906, Congress authorized the Secretary to ex■change the 111,385 acres for 87,000 acres within the reservation. The Land Company agreed to the exchange, and it was consummated. The 87,000 acres acquired by the Land Company were covered for the most part with a heavy and -extremely valuable growth of merchantable pine timber, at least 1,713,000,000 feet, worth about $1.50 per thousand feet, which was later sold by the Land Company to a lumber -company for $3,700,000.
April 30, 1908 (35 Stat. 70, 92), Congress appropriated "$108,750 in payment for the 87,000 acres taken from the reservation. This act contained a referendum provision, ■and if the Indians accepted the sum appropriated they were to execute a release and relinquish to the United States all ■claims and demands of every kind and character growing out of this transaction. The Indians accepted the sum •appropriated for them; it was paid to them and the release set forth in Finding 17 was duly executed as the act ■provided.
This court and the Supreme Court, as previously noted, decided that the release precluded the Indians from recovering any additional sum for the 87,000 acres. May 15, 1936, Congress enacted the following special jurisdictional ;act:
An Act To amend an Act entitled “An Act authorizing certain tribes of Indians to submit claims to the Court of Claims, and for other purposes”, approved May 26, 1920.
*463 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That in the suit numbered E-346 heretofore instituted in the Court of Claims by the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians under an Act entitled “An Act authorizing certain tribes of Indians to submit claims to the Court of Claims, and for other purposes”, approved May 26, 1920, jurisdiction is hereby conferred upon said court, and it is hereby authorized and directed, irrespective of any release or settlement, to reinstate and retry said case and to hear and determine the claims of the plaintiffs on the merits, and to enter judgment thereon upon the present pleadings, evidence, and findings of fact, with the right of appeal, rather than by certiorari, to the Supreme Court of the United States by either party: Provided, That any payment heretofore made to the said Indians by the United States in connection with any release or settlement shall be charged as an offset, but shall not be treated as an estoppel. (49 Stat. 12760
In response to plaintiffs’ present petition the defendant asks the court to amend the findings made by this court and upon which the court predicated its opinion in the first trial of the case, 81 C. Cls. 79. If we deemed it vital to the issue raised by defendant’s suggested amendments we would amend our previous findings. We decline to amend them, not upon a lack of judicial power to do so, but because in our opinion the findings as made save to defendant the right to raise the contention relied upon.
The special act involved removes from the defendant all right to insist upon the release and settlement above referred to as a bar to recovery and accords the plaintiffs the right to sue as provided therein, with this governmental defense completely eliminated. What the court now has before it, in view of the previous adjudications noted, is simply the ascertainment of the sum the Indians are entitled to recover, and whether this sum shall bear interest, not as such but as a part of just compensation.
The defendant contends, as it did in the original case, that the Indian title to the 87,000 acres was not permanent or exclusive, merely a right to occupy the lands, and subject to termination by certain articles of the treaty of 1864. It is asserted that inasmuch as the treaty provisions set aside *464 the delimited reservation to plaintiff Indians, they to occupy the same “until otherwise directed by the President of the United States”, the act of Congress taking the 87,000 acres, was an exercise of this power.
We cannot assent to the proposition. The President did not exercise any such power if he possessed it. On the contrary, Congress recognized the Indians’ right to the lands, and sought to pay for them. The Indians have been and now are in peaceable and undisturbed possession of the reservation, and this record discloses no single act of any character emanating from Congress or the President inimical to. their ownership of the reservation.
Again it is contended that Indian title to timber upon the reservation is a qualified and conditional one, and we are asked to find that the value of the 87,000 acres exclusive of the timber thereon is $87,000, and that the timber possessed a separate value of $3,436,000, the purpose being to emphasize a contention that the sole title to the timber on the lands which the Indians possessed was to cut off so much as necessary to clear certain portions for cultivation, for building and other purposes incident to a tenancy by right of occupancy, and did not extend in any event to the right to sell the standing timber to anyone. This court had occasion to discuss the issue thus raised in the very recent case of the Shoshone Tribe of Indians v. The United States, No. H-219, decided June 1,1937 (ante, p. 331). In that case Judge Littleton exhausted the subject and to what was said therein as applicable to this case we adhere.
It is finally contended that the 87,000 acres involved were taken by the United States under and in virtue of its plenary power over Indian tribal lands and funds, and not by the exercise of its power of eminent domain. The basis for this argument is said to be the fact that the lands taken were not taken for a public purpose but were taken “to use them as a consideration for the purchase of other land, which could have been acquired under that power”, and hence their value must be fixed as of the date appropriated, exclusive of interest to date of payment.
It is conceded that the original congressional grant of lands to the State of Oregon in 1864 was one made for a, *465 public purpose. Tlie 111,385 acres of plaintiffs’ lands were included within the grant. It is true it was a mistake to so include the lands. Nevertheless, the courts decided that the 111,385 acres of plaintiffs’ lands passed to the State of Oregon and title vested in the State’s grantees. Clearly then, if the transaction had rested at this point, the taking of the 111,385 acres would have been by the exercise of a governmental power akin, as the courts say, to eminent domain, and the 87,000 acres eventually entered into this transaction to,- and did, accomplish an identical purpose, a public grant of lands to the State of Oregon.
The Government under a long line of decisions, familiar and too numerous to cite, applicable to Indian treaties and its relationship to tribal Indians, was under an obligation to pay the Indians for the 111,385 acres. Instead of paying at the time in cash, the Government acceded to the Indians’ desires and wishes, the 87,000 acres were taken as a substitute for the 111,385 acres mistakenly taken, the latter recovered and the former lost to the Indians. No fact of record negatives a governmental intention to pay the Indians for the 87,000 acres, and they became a part of the consideration paid the land company for the building of the military road. We think, under the decision of the Supreme Court in the case of Shoshone Tribe of Indians v. United States, 299 U. S. 476, plaintiffs are entitled to interest as a part of just compensation.
The plaintiffs are entitled to judgment under findings 11, 12, and 20 as follows: Value of property taken on August 22,1906, $2,980,000, which, less $108,750 paid April 30, 1908, leaves an unpaid balance due plaintiffs as the value of the property on the date it was taken of $2,871,250; the additional amount to be added to this unpaid value of $2,871,250 in order to make just compensation in conformity with the decision of the Supreme Court in the Shoshone Tribe of Indians v. United States, supra, is $4,420,528.56 measured by-interest at 5% per annum on the unpaid value of the property taken from August 22,1906, the date of taking, to June-7, 1937, the date of judgment.
The total due plaintiffs on June 7, 1937, is therefore $7,291,778.56. From this amount there must be deducted *466 under the jurisdictional act gratuity disbursements made by the United States for the benefit of plaintiffs, which total is a proper offset against the amount found to be due the plaintiff tribes, and we have determined the total offset to which the defendant is entitled to be $1,978,431.24. The deduction of this amount from the amount of $7,291,778.56 due plaintiff tribes as just compensation for their property taken in 1906 leaves $5,313,347.32, for which judgment will be entered in favor of plaintiffs with interest at 5% per annum on $2,871,250 from June 7, 1937, until date of payment. It is so ordered.
Whalex, Judge; Williams, Judge; LittletoN, Judge; and GeeeN, Judge, concur.