167   62
e205   ³ 76
f205   ⁸582
205   ²588
205   ²589
206   ⁰586

167   62
d208   457
d 25 SC ²120
e 25 SC ²126
  25 SC ²127
d 25 SC 128
d 25 SC 130
  25 SC ⁶374
  25 SC ⁰568
e 26 SC ⁷162

167   62
30 SC ³551
30 SC ³558

167   62
215   ⁴602
31 SC ²231
31 SC ⁴359

167   62
f219   ⁶573

# Pennsylvania R. R., Appellant, *v.* Montgomery County Passenger Railway.

[Marked to be reported.]

*Street railways—Suburban lines—Country roads—Act of May* 14, 1889.

The street railway act of May 14, 1889, P. L. 211, does not contemplate or provide for the construction of long lines of transportation, connecting widely separated cities and towns by electric railways, traversing country roads.

A distinction exists between urban and suburban property as to the right of corporations to occupy a highway for a street passenger railway. A city or borough may impose the additional servitude of a street railway upon the city or borough streets, but the authorities of a township cannot impose such additional servitude upon roads without the consent of the abutting landowners.

When the supervisors of a township give their consent to the occupation of township roads by a street railway, they act as the representatives of the people, who build and use the roads, and not as the representatives of the owners of the private property over which the roads pass. The company can only protect itself by securing the consent of every property owner along the roads which it wishes to occupy.

*Street railways—Consent of local authorities—Form of consent—Evidence.*

The consent of the supervisors of a township to the use of township roads by a street railway company is invalid, unless it is given at a regularly convened meeting of the supervisors, and the proceedings should be entered in the townhip books kept by the town clerk.

A paper signed by the supervisors, in the pocket of a contractor, or of some officer of a corporation, is not the proper evidence of action by the township.

*Street railways—Construction of railways without consent—Estoppel.*

Where township officers and owners of land abutting upon roads have stood by and permitted the expenditure of large sums of money in the construction of a street railway upon the roads, they cannot afterwards demand that the railway shall be torn up or its use enjoined.

*Street railways—Construction of line before consent of all municipalities obtained.*

If a street railway company is chartered to be constructed from one point to another, and its line must necessarily pass through a city, borough, or township intermediate between the termini; and that city, borough or township refuses its permission, the power to build the road described in the application and charter cannot be exercised. It must be possible for the company to complete its line before it has a right as against any city, borough or township into which its line extends to begin work.

Argued Feb. 6, 1895. Appeal, No. 139, July T., 1894, by plaintiff, from decree of C. P. Montgomery Co., June T., 1893, No. 1, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ. Reversed.

Bill in equity to restrain the construction of a street railway. The bill averred:

1. That the said company is a corporation of the commonwealth of Pennsylvania under an act entitled An act to incorporate the Pennsylvania Railroad Company, approved April 13, 1846, and became the owner of said road by virtue of proceedings under an act entitled " An act for the sale of the main line of public works," approved May 16, 1857.

2. The said plaintiff company has held, owned and occupied its main line and still operates its main line of railroad from Philadelphia to Pittsburg.

3. That by virtue of its " branching powers " it has constructed and now operates a branch railroad leading from its main line at Glen Loch in the county of Chester through the county of Montgomery to the county line between the counties of Bucks and Montgomery, known as Trenton Cut-off.

4. That the said plaintiff owns in fee simple certain land in Upper Merion township, Montgomery county, subject to a certain township road known as the Schuylkill River road, and that over said road the said company has constructed an iron bridge for the sole passage of its cars and so as not to impede the public travel.

(5. Recited the act of assembly approved May 14, 1889, P. L. 211, entitled " An act to provide for the incorporation and government of Street Railway Companies in this commonwealth.")

6. That on June 30, 1893, the defendant company was chartered under the act of assembly of May 14, 1889, for the purpose of constructing, maintaining and operating a street railway for public use upon certain streets in the boroughs of Bridgeport, West Conshohocken and Conshohocken, and upon certain public roads in the townships of Upper Merion and Whitemarsh, Montgomery county.

7. That the said route passes over the land of the appellant and for a distance of two miles through a rural region. That

said act of assembly did not contemplate the building of pas-
senger railways on public roads outside of cities and boroughs
in the manner proposed, and averred that the said defendant
company has no legal authority to build its said railway on the
line designated and prescribed by its charter.

8. That the defendant company has no right under its char-
ter to build passenger railways elsewhere than on streets, and
that said act of assembly is unconstitutional.

That the fee in the said public road being in the owner, the
appellant, the public has the mere right of passage, and the
owner has the use of the land for his own purpose in any way
that is not inconsistent with the public easement, and is not
required to make the land subject to additional and different
burdens of a railway not contemplated when the land was ap-
propriated for a public road, and when the defendant proposes
to occupy said road for its purpose it is a taking of the appel-
lant's land within the meaning of the constitutional provision
requiring just compensation to be made for property taken,
injured or destroyed, and therefore the said defendant has no
legal power or authority to construct or maintain its railway
without the permission of appellant, to the injury of appellant,
it not having been granted the power to exercise the right of
eminent domain by the legislature of the commonwealth of
Pennsylvania.

That under the provision of the act of assembly approved
June 19, 1871, entitled, " An act relating to legal proceedings
by or against corporations," it is the duty of the court to exam-
ine, inquire and ascertain whether the defendant corporation
does in fact possess the right or franchise to do the act from
which the injury to the plaintiff's rights and franchise will
result, etc.

And praying for a preliminary injunction until hearing, and
perpetual thereafter, restraining the defendant from construct-
ing its railway on the lands of the plaintiff in Upper Merion
township, or upon the township road; that the court should
inquire whether the defendant possesses the right or franchise
it claimed; and for other relief.

The defendant admitted the facts stated in paragraphs 1, 2
and 3 of the bill.

To the 4th paragraph of the bill it averred that the plaintiff

is not the owner in fee of the bed of the township road.   The 5th and 6th paragraphs of the bill were admitted to be true.

To the 7th paragraph of the said bill it averred that it was a street passenger railway company within the meaning of the act of assembly; has full legal authority to construct and operate its said railway on the line designated in its charter; that it had the consent of the supervisors of Upper Merion township to construct its railway upon the route set forth in its charter; and that said route passes over no land of the plaintiff, and does not interfere with any of plaintiff's rights.

The case was referred to Charles Hunsicker as master, who found further facts as follows:

" That the plaintiff company owns the fee described in deed from John C. Wilson to Pennsylvania Railroad Company dated December 20, 1889.

" That the River road is an old public highway which existed before plaintiff purchased and before the construction of defendant's road.

" That the plaintiff still owns said land over which land the River road runs.

" That the supervisors of Upper Merion township gave their consent to the location, construction and operation of the defendant's road over the River road.

" That the defendant company built their road after bill filed in this case, beginning at their point of beginning as far as Hecksher's Furnace at Swedeland which is about midway between West Conshohocken and Bridgeport.   It is further agreed that the consent of the local authorities of West Conshohocken has not been obtained.

" Nor has the consent of the township authorities of Whitemarsh township been obtained.

" The conditions on which the consent of the county commissoners of Montgomery county for crossing the county bridge at Matson's Ford connecting the boroughs of West Conshohocken and Conshohocken have not been complied with.

" The borough of Conshohocken had given its consent to. the use of certain streets by an ordinance adopted on March 15, A. D. 1893, subject to certain conditions, none of which were complied with, and on January 10, A. D. 1894, the said borough enacted an ordinance giving the exclusive right to use the same

streets to the Conshohocken Railway Company and to operate the same by electricity. The first above named ordinance required the company to construct its road within nine months, and it did not do so."

The master found, as a conclusion of law, that the defendant company had no right to begin the construction of its road until it had obtained the consent of all the municipalities through which the road was to be built. He therefore recommended a decree in accordance with the prayer of the bill.

Exceptions to the master's report were sustained in an opinion by WEAND, J., and a decree entered dismissing the bill.

*Error assigned*, among others, was (2) in dismissing the bill.

*Charles H. Stinson* and *David W. Sellers*, *C. Henry Stinson* and *William F. Solly* with them, for appellant.—The appellee is a mere trespasser and is not empowered, not having the right of eminent domain, to construct its electric railway over the public road on the appellant's land without its consent. Sterling's App., 111 Pa. 35; Mifflin v. Railroad Co., 16 Pa. 182, Arthur Chambers v. Daniel Furry et al., 1 Yeates, 167; A. Kirk Lewis v. Thomas Jones et al., 1 Pa. 336; Chess v. Manown, 3 Watts, 219; Phillips v. Dunkirk, Warren & Pittsburg R. R. Co., 78 Pa. 177; Lance's Appeal, 55 Pa. 16; Jones v. Erie & Wyoming Valley R. R. Co., 151 Pa. 30; Junction R. R. v. Boyd, 8 Phila. R. 224; Trustees etc. v. Auburn & Rochester R. R. Co., 3 Hill, 567; Williams v. N. Y. Cent. R. R. Co., 16 N. Y. Rep. 97; Mahon v. N. Y. Cent. R. R. Co., 24 N. Y. Rep. 658; Bloomfield & Rochester Gas Co. v. Calkins, 62 N. Y. Rep. 386; Inhabitants of Springfield v. Connecticut River R. R. Co., 4 Cushing (Mass.) 63.

The title of the act of assembly of May 14, 1889, under which the appellee claims its right to build its electric railway, does not refer to anything but streets, and does not include township roads, and in the body of the act the words used are "streets" and "highways," and in no place in said act is the word "road" used.

The signification of the word "street" is well defined: Elliott on Roads and Streets, 5; Grace v. N. Y. Cent. R. R., 27 N. Y. 267; State v. Moriarty, 74 Ind. 104; Heiple v. East Portland, 13 Ore. 97; Perrin v. N. Y. Co., 36 N. Y. 120.

There is certainly a very great difference between the streets of a city, town or village and the ordinary country roads: Cincinnati v. White, 6 Peters, 431; Moyamensing Av., 4 S. & R. 105; Sharrett's Road, 8 Pa. 89; Osage St., 90 Pa. 117; McDevitt v. Peoples' Nat. Gas Co., 160 Pa. 367; Indianapolis v. Croas, 7 Ind. 9; Lafayette v. Jenners, 10 Ind. 74–79; Clark v. Com., 14 Bush (Ky.) 166.

When the act of 1889 speaks of streets or highways, it refers to the streets or highways of a city, town or village: Cochran v. Library Co., 6 Phila. 492.

The subject of building passenger railways on township roads is not at all expressed in the title of an act providing for the "incorporation of street passenger railways." The two things are entirely different. Expressio unius est exclusio alterius: Dorsey's Appeal, 72 Pa. 192; Union Passenger Railway Company's Appeal, 81 Pa. 91; Beckert v. Allegheny, 85 Pa. 191; Road in Phœnixville, 109 Pa. 44; Rogers v. Improvement Co., 109 Pa. 109; In re Carbondale Turnpike Road, 22 W. N. C. 105.

The consent of both local authorities and the landowners must be obtained: In re King's County Elevated R. R., 105 N. Y. 97; Rochester Electric Ry. v. Wilkins, 123 N. Y. 361.

The road law of 1834 clearly defines the duties of supervisors to be "to open and keep the public roads in good condition." They have no legislative powers: Kittanning Academy v. Brown, 41 Pa. 270; act of April 15, 1834, P. L. 538, Purd. Dig. 364.

*N. H. Larzelere* and *John G. Johnson, James B. Holland* with them, for appellee.—The owner of lands bounding on a public highway has no right to compensation because of the construction thereon of an electric railway. The appellant had no greater right to compensation than it would have possessed had its land been located on a street of a borough: Sterling's App., 111 Pa. 37; McDevitt v. Peoples Nat. Gas Co., 150 Pa. 367; Rafferty v. Cent. Transportation Co., 147 Pa. 590.

The Schuylkill River road, upon which the railway of the appellee was being laid, was a street or highway within the meaning of the act of 1889.

The act of 1889 does not restrict a street railway company

organized thereunder, to the construction of its road in only one township, borough or municipality.

It is the right of a passenger railway company, organized under the act of 1889 for the construction of a road extending through more than one municipality, borough or township to construct such road in parts, as the same from time to time shall be authorized to be constructed by the local authorities immediately concerned.

An abutting landowner has no right, where the construction of the railway is with the consent of the authorities of the locality in which it is being laid, to object to such construction because the consent of the authorities of other localities, through which the same runs, has not been obtained: Phila. v. Gray's Ferry Pass. Ry. Co.'s App., 102 Pa. 123; Market Co. v. Phila. & R. Terminal R. R., 142 Pa. 593; Junction Pass. Ry. v. Williamsport Pass. Ry., 154 Pa. 116; Nat. Docks R. R. v. Cent. R. R., 32 N. J. Eq. 760; Ottaquechee Woolen Co. v. Newton, 57 Vt. 451.

The act of June 19, 1871, does not authorize this collateral attack on defendant's charter: West. Pa. R. R. Co.'s App., 104 Pa. 406; Market Co. v. Phila. & R. Terminal R. R., 142 Pa. 592; Germantown Ry. v. Citizens' Pass. Ry., 151 Pa. 138.

The supervisors of a township are the local authorities whose consent is required by the act of 1889.

OPINION BY MR. JUSTICE WILLIAMS, March 25, 1895:

Our system of street passenger railways had its origin in the days of special legislation. Each company then had its own act of incorporation in which its route was described and its powers defined. These companies were confined to the cities and large towns of the state, and their cars were moved by horse power, and were a substitute for the omnibus and other vehicles devoted to the carriage of passengers which had been previously in common use. After the adoption of the new constitution the practice of separate legislation for each company became impracticable, and in 1878 a general law was passed providing for the organization of street railway companies for the purpose of "constructing, maintaining and operating a street railway for public use in the conveyance of passengers." No power of eminent domain was conferred on these companies,

but the several provisions of the act show that such railways were to be constructed upon the ·streets, conforming to the grade of the streets, and subject to the regulation of the municipal authorities.   The act of 1876 gave to street railway companies in cities of the first class the right to "use other than animal power" in the movement of their cars.   The act of May, 1878, conferred the like right upon street railway companies in cities of the second and third classes.   The general law further provided that any company organized under its provisions should maintain an office for the transaction of its business "in the city" where its railway was located.   All these provisions show that the street railways contemplated by the general act of 1878 were intended for the accommodation of the crowded streets of cities and for no other purpose.   The present general law relating to these corporations was passed in 1889.   It was intended to bring together the valuable provisions of several acts of assembly into one comprehensive statute, and to make some changes that experience had shown to be desirable.   It authorized the incorporation of five or more persons for the purpose of "constructing, maintaining and operating a street railway on any street or highway upon which no track is laid or authorized to be laid" under existing charters, with the privilege of occupying "any street" . . . . by any power other than by locomotive.   It required the route to be set out in the application for incorporation, stating the streets and highways upon which it was to be built, and showing "the circuit of the route, the amount of the capital stock of the company," and other particulars.   It required all companies incorporated under its provisions to maintain an office where the railroad was located.   Section 15 provided that "no street passenger railway shall be constructed by any company incorporated under this act within the limits of any city, borough or townships without the consent of the local authorities thereof, nor shall any street passenger railway be incorporated hereunder which shall not have a continuous route from the beginning to the end, forming a complete circuit with its own track, excepting the five hundred feet to be used under section fourteen hereof."

From these provisions we think it is apparent that the attempt now being made to convert these city conveniences

into long lines of transportation connecting widely separated cities and towns by electric railways traversing country roads, was not anticipated or provided for by the legislature. The failure to confer upon these companies the power of eminent domain would, if it stood alone, be sufficient to justify this conclusion. The land taken for streets in cities and boroughs is in the exclusive possession of the municipality, which may use the footway as well as the cartway for any urban servitude without further compensation to the lot owners: Provost v. The Water Company, 162 Pa. 275; Reading v. Davis, 153 Pa. 360; McDevitt v. The Gas Company, 160 Pa. 367. Nor does the construction of a street passenger railway upon the surface of the street impose any additional servitude upon the property fronting on the street so occupied: Rafferty v. The Traction Company, 147 Pa. 579. But the easement acquired by the public by proceedings under the road laws is an easement for passage only. The owner is entitled to the possession of his land for all other purposes. We held therefore in Sterling's Appeal, 111 Pa. 35, that the occupancy of a country road by a pipe line imposed an additional servitude upon the farm owner; while in McDevitt v. The Gas Company, supra, we held that a pipe line, laid within the limits of the street by authority of the city did not impose any additional servitude on the lot owner.

The reason for the distinction is fully stated in the opinion in the latter case. The same distinction exists, and for the same reasons, between urban and suburban property as to the right of corporations to occupy a highway for a street passenger railway. This, as will be seen by the cases cited above, is an urban servitude to which suburban property has not been subjected by law up to this time. The consent of township authorities justifies an entry upon the public road so far as the public is concerned, but the supervisors of the townships have no power to bind private property or subject it to a servitude for the benefit of any person or corporation other than the township and the public it represents. The carriage of passengers through the township on their journey from one city or borough to another by rail is in no sense a township purpose; and whether these passengers make their journey in cars drawn by a locomotive over a steam railroad, or in those propelled by

electricity over tracks laid upon the highways, is immaterial both to taxpayers and to landowners along the route traveled except as the adoption of one or the other of these modes of transportation may affect the township roads or the private property of citizens. When the supervisors give their consent to the occupation of the township roads by a street railway they speak as the representatives of those who build, and those who use the roads, but not as the representatives of the private property over which the roads pass. The street railway companies cannot reach the property owners either through " the local authorities " or by the right of eminent domain, as the law now stands ; and it is not easy to see how such a company can protect itself in the use of country roads except by contract with every owner of property along the roads they wish to occupy.

The trouble is that the supposed needs of the country have outgrown its legislation, and an effort is now being made to adapt street railways to purposes for which they were never intended, and for which the existing legislation relating to them was not framed.

Cities and boroughs possess the necessary power over their streets to enable them to authorize their use by a street railway. Townships do not possess municipal powers, and under existing laws their control over the public roads is limited. But in this connection another interesting question suggests itself. How is the assent of " the local authorities " to be obtained in any given case, and what is the proper evidence that it has been given ? The township books in the custody of the town clerk are the records of the township, and should afford evidence of the action taken by the supervisors in all matters of public importance. A paper in the pocket of a contractor or of some officer of a corporation is not the proper evidence of action by the township, or the school district. The action needed is not that of the individuals who compose the board, but of the official body. Thus it was held that a contract signed by the members of the school board separately did not bind the district. The best evidence of their official action was their minutes kept by the secretary : Wachob v. Bingham School District, 8 Phila. 568. For the same reason a contract signed by the president and secretary was held to be invalid.

It had not been acted upon by the board when in session: School District v. Padden, 89 Pa. 395.   One supervisor may bind the township by an act that is ministerial in its character: Dull v. Ridgway, 9 Pa. 272; Pottsville v. Norwegian Township, 14 Pa. 543.   Not so however when the act is one that requires deliberation and the exercise of judgment: Cooper v. Lampeter Township, 8 Watts, 125; Township v. Gibboney, 94 Pa. 534; Township v. Parson, 105 Pa. 360.   In such cases the supervisors must be together and their action must be taken in their official character, and should appear upon the township book kept by the town clerk.   If not so taken it does not bind the township, and has no validity whatever.   The supervisors should consider and deliberate upon any application made to them for leave to occupy any of the township roads with a street railway.   If they decide to grant the application upon certain terms and conditions as to the manner and extent of the occupancy permitted and the extent of repairs to be required, these terms should appear in the record of the meeting as well as the consent; and a contract that does not rest on such official action properly taken by the proper officers is utterly worthless.

But we know as matter of current history that street railways have been projected, and actually constructed, and are now in operation, over country roads where no legal consent has been obtained, and where no attention has been paid to the rights of property holders.   Such railways cannot now be torn up or enjoined either by the township officers or at the instance of landowners along their routes.   Where such enterprises have been allowed to proceed and the expenditure of large sums of money has been permitted, it would be inequitable to correct at this time what was a mutual mistake under the influence of which these enterprises have been pushed to completion; but it would seem desirable that such charters should not be granted in future until the legislature has made such provision for the assessment of damages to property as shall protect the owners from the additional servitude which the construction of electric railways does certainly impose upon all adjoining owners outside of municipal boundaries.

At present an action at law is the only remedy within the reach of an injured person who has suffered a railway to be

built across his land without objection; but equity will interpose to protect him if he comes in proper time, by enjoining the construction until his damages have been paid or secured to his satisfaction.

The only remaining question raised in this case is over the right of a street railway to build any part of its line before it has the right to complete it.   A steam railroad may enter upon any part of its line and commence building subject only to its duty to complete the line in accordance with its charter.   The reason of this is that it is clothed with the power of eminent domain, and may enter and appropriate land regardless of the will of the owner.   A street railway company, as we have seen, does not possess the power of eminent domain.   It cannot build under its charter alone.   It must have the consent of the proper municipal or local authorities or it cannot move.   If the proposed line passes through a city, borough or township intermediate the termini, and that city, borough or township refuses its permission, the power to build the road described in the application and charter cannot be exercised.   It must be possible for the company to complete its line before it has a right as against any city, borough or township into which its line extends, to begin work.   It is not possible for such company to complete its line without the consent of the local authorities of the districts through which it passes; and where this is refused in one or more of the municipal or quasi municipal divisions through which its line runs, the building of its proposed road under its charter is an impossibility.   Let us suppose, for purposes of illustration, a charter to authorize the construction of a street railway from *a*, through certain roads in *b*, *c*, and *d*, to the city of E; and that consent has been obtained from the local authorities of *a*, of *c*, and of E, but refused by the local authorities of *b*, and *d*.   The proposed line is thereby cut up into three wholly unconnected pieces.   It is very clear that under a charter authorizing the building of a line of road from *a* to E, the company could not lawfully build three distinct local roads, viz, one in *a*, another in *c*, and the third in E.   The consent given by " *a* " to the construction of the line of road authorized by the charter would not estop the local authorities from objecting to the construction of a local road within its own limits.   When confronted with its own

consent "*a*" could well reply "the road to which consent was given is not the road you are now building, for the building of that road has become impossible by the action of the authorities of *b* and *d.*"

The learned judge of the court below said in the conclusion of his opinion, "corporations of this character are multiplying rapidly and we may assume they are demanded by the public." This is a strong reason for meeting the questions involved in this case squarely, that the legislation needed to protect property owners against this class of corporations may be had, at the same time that the powers necessary to convert what was intended as an urban convenience into a general mode of transportation are considered and conferred by the lawmakers.

In this case the defendant's line of so-called street railway extends through two boroughs, two townships and over one county bridge over the Schuylkill river. The line and circuit of its road over the several highways to be occupied is fully set forth in its charter.

The consent of the local authorities of West Conshohocken borough and of White Marsh township were refused, that of Upper Merion township was given, that of the borough of Conshohocken was given and has since been withdrawn. Under such circumstances the building of the line of street railway described in, and authorized by the charter is impossible, and the company has no right to proceed. The conclusions of the learned master were correctly drawn and the decree recommended by him should have been made.

The decree appealed from is now reversed and the record remitted with direction to the court below to make the decree recommended by the master awarding the injunction prayed for. The costs of this appeal to be paid by the appellee.